ORDERED.

**Dated:  March 17, 2022**

Roberta A. Colton
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:

JEFFREY SHATUSKY,

              Debtor.

_____/

Case No. 8:22-bk-00131-RCT
Chapter 7

**ORDER DENYING JOINT MOTION TO APPROVE
POST-PETITION ATTORNEY FEE FINANCING ARRANGEMENT,
WITHOUT PREJUDICE, AND ORDER ON UNITED STATES TRUSTEE'S
MOTION TO REVIEW ATTORNEYS' TRANSACTIONS WITH THE DEBTOR**

In *Lamie v. United States Trustee*,[1] the Supreme Court held that counsel for a Chapter 7

debtor cannot be paid from the bankruptcy estate and that any amounts due to counsel at the time

the bankruptcy petition is filed are dischargeable.  Since then, courts and consumer attorneys have

struggled to find a way to help Chapter 7 debtors who cannot afford counsel on the front end of a

bankruptcy case to avoid having to file their cases without the assistance of counsel.

To address the problem of unrepresented consumer debtors, courts have considered

bifurcated contracts that separate pre-petition services from post-petition services.  With a few

_____

[1] 540 U.S. 526 (2004)

exceptions, bifurcated contracts are a recognized tool to assist debtors who have insufficient cash upfront to hire an attorney to file a Chapter 7 bankruptcy case.[2]  Of course, bifurcated contracts are permissible only if they meet stringent ethical and statutory requirements.  Bankruptcy courts play an important role in policing bifurcated contracts to avoid abuse of vulnerable debtors and to ensure compliance with the Bankruptcy Code.

With a typical bifurcated contract, a debtor pays little or nothing up front for pre-petition services and then enters into a separate agreement with counsel for post-petition services.  The burden falls on debtor's counsel to finance the fees for post-petition work by waiting for payments over time.  To ease this burden, consumer attorneys first turned to factoring arrangements, where attorneys sell their receivables to third parties at a discount, with complex representations, warranties, and buy-back provisions. Factoring arrangements have faced mixed results in bankruptcy.[3]

This case represents the next chapter in the saga.  Jeffrey Shatusky ("Debtor") did not have enough money to pay the lump sum attorney's fees for a Chapter 7 petition because his wages had been garnished.  So, he signed a bifurcated fee agreement with his attorney's law firm, Debt Relief Legal Group, LLC ("DRLG").  Pre-bankruptcy he paid his own filing fee, and DRLG agreed to represent him *pro bono*.  Post-filing, he signed a second agreement to pay a flat $2,000 fee either

---

[2] *Walton v. Clark & Washington, P.C. (In re Walton)*, 469 B.R. 383 (Bankr. M.D. Fla. 2012); *In re Brown*, 631 B.R. 77 (Bankr. S.D. Fla. 2021); *In re Hazlett*, No. 16-30360, 2019 WL 1567751 (Bankr. D. Utah Apr. 10, 2019); *In re Carr*, 613 B.R. 427 (Bankr. E.D. Ky. 2020); *In re Milner*, 612 B.R. 415 (W.D. Ok. 2019). *But see In re Baldwin*, 2021 WL 4592265 (W.D. Ky. Oct. 5, 2021) (concluding that the bifurcated fee agreements before the court violated the Bankruptcy Code).

[3] *See Baldwin*, 2021 WL 4592265 at *11 (holding that the factoring arrangement before the court failed to meet ethical and the statutory requirements); *Hazlett*, 2019 WL 1567751, at *12 (discouraging the use of the specific factoring arrangement before the court, as well as any similar arrangement, unless it strictly complied with the state's Rules of Professional Conduct and was fully disclosed, and even then, the court stated that such arrangement would be subject to court review).

from his own resources or with a loan from Rebound Capital, LLC ("Rebound"). The lending arrangement was prearranged by DRLG.[4]  Debtor elected to go with Rebound.

With this brief background, and after a preliminary hearing on February 17, 2022, the Court considers two motions: (1) Debtor and Rebound's Expedited Joint Motion to Approve Post-Petition Financing Arrangement (Doc. 9) (the "Approval Motion"), the United States Trustee's Objection (Doc. 18), and Debtor and Rebound's Joint Reply (Doc. 22); and (2) the United States Trustee's Motion to Review Attorneys' Transactions with the Debtor and Grant Related Relief (Doc. 19) (the "UST Motion") and Debtor and Rebound's Joint Reply (Doc. 22).

In the Approval Motion, Debtor and Rebound seek approval of both the bifurcated fee arrangement (more specifically, the post-petition agreement between Debtor and DRLG), as well as the proposed financing agreement with Rebound.  The UST Motion asks the Court (i) to review the pre- and post-petition agreements signed by Debtor; (ii) to cancel the post-petition bankruptcy agreement between Debtor and DRLG; (iii) to cancel the financing agreement between Debtor and Rebound; and (iv) to order DRLG to disgorge all of the attorney's fees received.

As explained below, the Court denies the Approval Motion without prejudice. The proposed bifurcated contract between Debtor and DRLG is permissible in principle, but it contains deficiencies which preclude approval as filed.  Likewise, the proposed arrangement with Rebound needs further refinement before it can be properly evaluated.  With respect to the UST Motion, the Court grants the request to review both the pre- and post-petition contracts.   Otherwise, the UST Motion is denied without prejudice.  The Court will give Debtor and Rebound the opportunity to amend the existing agreements, consistent with this Order.  The United States Trustee will then have an opportunity to weigh in on the amended documents.

---

[4] At this stage of the proceedings, the relationship between DRLG and Rebound is not clear.

## I. Background

Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on January 12, 2022. Prior to that date, Debtor consulted with DRLG regarding his suitability for filing for bankruptcy. Debtor was having difficulties supporting his family due to a pending wage garnishment. DRLG determined that if Debtor could eliminate the wage garnishment and other liabilities, Debtor would be able to pay his debts as they came due post-discharge and rebuild his credit.

### Bifurcated Fee Agreements[5]

DRLG offered Debtor two options to pay for DRLG's legal services. Under Option One, Debtor could pay a discounted flat fee of $1,800 before the filing of his bankruptcy petition,[6] and DRLG would represent Debtor through discharge. Under Option Two, Debtor could retain DRLG using the law firm's bifurcated retainer program (the "Two Contract Program"). Under the Two Contract Program, Debtor would sign a pre-petition contract, and DRLG would agree to represent Debtor *pro bono* to prepare the basic documents necessary to initiate his Chapter 7 case (the "First Contract"). Thereafter, Debtor would have the option of signing a post-petition agreement for DRLG to perform the remaining routine services necessary to represent Debtor through discharge for a flat fee of $2,000 (the "Second Contract").

---

[5] Bifurcated fee agreements are used to separate the Chapter 7 bankruptcy services counsel provides to a client pre-petition from those provided post-petition. *See Brown*, 631 B.R. at 91. The purpose of such bifurcation is that attorney's fees for pre-petition services are not collectible post-petition due to the automatic stay and then the Chapter 7 discharge, whereas the fees for post-petition services remain collectible after the Chapter 7 discharge. *See In re Griffin*, 313 B.R. 757, 761-62 (Bankr. N.D. Ill. 2004) (citations omitted).

[6] DRLG maintains that it typically charges a $2,000 flat fee for a Chapter 7 case.

## Post-Petition Financing

If Debtor elected Option Two, but lacked the ability to pay $2,000, DRLG informed Debtor

that the fees could be paid through a financing arrangement offered by Rebound.  Rebound would

pay the $2,000 fee in full and, in exchange, Debtor would repay Rebound the $2,000 plus interest

at a 17.99% interest rate.  Debtor would repay Rebound in twelve monthly payments of $183.35,

for a total amount due (including interest) of $2,200.20.  (Doc. 9-1, p. 7).

If Debtor chose to finance his post-petition attorney's fees with Rebound, then Rebound

would separately invoice DRLG for a processing fee of $120.  Rebound would not deduct the $120

processing fee from the $2,000 fee Rebound paid to DRLG.  Instead, DRLG would separately pay

Rebound the $120 processing fee after being invoiced.

## Debtor Chooses Option Two

Debtor chose Option Two.  He signed the First Contract for *pro bono* services on January

11, 2022, which states in part:

> **Pre-petition Services.** Client understands that Firm is going to charge $ 0 for the following pre-petition bankruptcy services: (a) informing Client of Client's rights and responsibilities under the bankruptcy laws; (b) providing consultation to enable the Client to make an informed decision about filing Chapter 7; (c) advising Client of all available exemptions; (d) assisting the Client in complying with all of the requirements imposed by the bankruptcy laws and rules; (e) sending any pre-filing correspondence; (f) calculating current monthly income to determine if any presumption of abuse would arise under the Bankruptcy Code; (g) preparation and filing of the Chapter 7 Voluntary Petition, Statement of Social Security Number, Pre-filing Credit Counseling Certificate, and the List of Creditors.
>
> Client understands that once the bankruptcy is filed, Client will not be legally obligated to pay Firm any attorney fees for pre-petition services. . . .
>
> **Fees and Costs NOT Covered.** The fee above does NOT include certain mandatory costs associated with the preparation for and the

prosecution of this case including, but not limited to, the mandatory
Court filing fee ($338.00) and fees for credit reports ($40.00 each).

(Doc. 19-1, p. 2). The First Contract also provides that Debtor must pay his bankruptcy filing fee

of $338 in full or apply to the bankruptcy court to pay the filing fee in installments. (Doc. 19-1,

p. 2). Debtor paid the filing fee, in full, with his petition.

The First Contract included a separate document entitled, "Two Contract Procedure

Disclosure" (the "Disclosure") that explains DRLG's Two Contract Program and discusses

Debtor's post-petition options:

> **Post-petition Options.** This Pre-Petition Agreement contemplates
> that Firm will provide all of the necessary services required for
> commencing a Chapter 7 bankruptcy case on Client's behalf. Client
> understands that there is remaining post-petition legal work which
> is necessary to finish the bankruptcy case in order to receive an
> Order of Discharge. Failure to timely file the balance of Client's
> bankruptcy pleadings, provide necessary documentation to
> interested parties, or attend mandatory meetings may result in
> dismissal of Client's case and prejudice Client's right to file
> subsequent bankruptcy cases. Firm's contractual responsibilities will
> end upon completion of the filing of the bankruptcy case. However,
> Firm will remain professionally obligated to serve as counsel of
> record for the Client until the Bankruptcy Court allows Firm to
> formally withdraw.
>
> After the bankruptcy case is filed, Client shall have three options
> regarding post-petition representation as set forth below.

(Doc. 19-1, p. 7).

The Disclosure then sets forth the three options: (1) Debtor can retain DRLG post-petition;

(2) Debtor can retain other legal counsel post-petition; or (3) Debtor can proceed *pro se* post-

petition. If Debtor chooses to retain DRLG post-petition, the Disclosure informs Debtor that he

would sign the Second Contract for post-petition services. The Disclosure further informs Debtor

that if he retains DRLG for post-petition services, he can pay the legal fees for those services from

his own resources, or he can finance the legal fees through Rebound, if Rebound approves of him

for the financing.

The Disclosure sets forth the timeline for selecting one of these three options and provides that DRLG will continue to represent him under options (2) and (3) until the bankruptcy court enters an order authorizing DRLG to withdraw:

> **Timeline to Retain Firm Post-Petition.** Client shall have **fifteen (15) days** from the date Client's bankruptcy case is filed to retain Firm for the post-petition services in this case. If Client does not formally retain Firm within that period, then Client agrees and consents to Firm's withdrawal as counsel in this case and Firm may file a motion to withdraw as Client's attorney but will continue to represent Client until such time when the Court enters an order authorizing Firm to withdraw as Client's attorney in the bankruptcy case.

(Doc. 19-2, p. 8).  Debtor signed and acknowledged the Disclosure.

### The Post-Petition Agreement with DRLG

On January 17, 2022, after his Chapter 7 petition was filed, Debtor signed the Second Contract retaining DRLG for post-petition services.  (Doc. 9-1).  The introduction to the Second Contract states:

> Client agrees to employ Firm to represent Client in Client's pending Chapter 7 bankruptcy case (Case No. 22-00131). **Client has been advised that Client is not obligated to sign this Post-Petition Agreement and that Client may consult with another attorney as to whether Client should do so. Client has further been advised that Client may choose to retain another attorney apart from Firm, or proceed without legal representation in which case Firm will continue to represent Client until such time as the Court enters an Order authorizing Firm to withdraw from Client's bankruptcy case, or Client's bankruptcy case is closed or dismissed.**

(Doc. 9-1, p. 1).

The Second Contract describes the base legal services that are included and identifies certain services that are not included but that can be added for an additional fee:

**2. Base Legal Services.** The Base Legal Services included in this Post-Petition Agreement are the following:
• Preparing and filing Your Statement of Financial Affairs and Schedules of Assets and Liabilities and filing any necessary amendments to them (Required);
• Preparing and filing Your Means Test calculations and disclosures (Required);
• Meeting with You to review Your statements and schedules and have You sign them before we file them; (Required);
• Preparing for and attending Your Section 341 Meeting of Creditors, including any continuation of the Meeting (Required);
• Administrating and monitoring Your case and communicating with You throughout the process (Required);
• Forwarding the Trustee Questionnaire and debtor documents to the Trustee (Required);
• Review and responding to Trustee requests (Required);
• Noticing Your employer to stop any garnishments;
• Reviewing and advising You about any turnover demands from the Trustee;
• Reviewing and advising You about any Rule 2004 examinations and attending such an examination;
• Reviewing and advising You about any audit of Your case by the United States Trustee;
• Drafting or responding to claims or objections to claims;
• Preparing and filing a motion to reinstate Your case if it is dismissed;
• Reviewing and advising You regarding any motions for stay relief;
• Reviewing, advising You about, negotiating and attending any hearing about a proposed reaffirmation agreement or redemption;
• Reviewing and advising You about any lien avoidance matters;
• Reviewing and advising You regarding any creditor violations;
• Any other legal service required by the local rules (Required); and
• Enrolling Client into a credit reporting and education program after You obtain Your bankruptcy discharge that will monitor and assist the Client with rebuilding Your credit.

\*        \*        \*

**3. Non-Base Legal Services.** Legal services that exceed the scope of the Base Legal Services contemplated by the Retainer Fee may be provided by Firm post-petition for an additional fee, including but not limited to representing Client in: (a) converting the case to a Chapter 13 ($3,700-$4,200); (b) motion for mortgage modification ($1,800-$2,400); (c) Section 523 or 727 objections to discharge; (d) discharge proceedings, including those related to student loans, taxes or undue hardships; (e) motions for relief from, or

continuation, defense or enforcement of the automatic stay (f) motions to redeem personal property($600.00); (g) rule 2004 examinations; (h) motions to avoid liens/judgments($500.00); (i) adversary proceedings; (j) contested matters regarding Client's claim of exempt property; (k) filing any amendments to the schedules; (l) motions to continue the 341 meeting of creditors and/or appearing for a continued 341 hearing ($150.00); (m) motions or adversary complaints to abandon/refinance/ sell/purchase property; (m) assisting in carrying out the Debtor's Statement of Intentions; (n) monitoring an "asset case"; ( o) re-opening a bankruptcy case to submit post-filing proof of pre-discharge counseling; (p) representing You in any municipal, county, state or other local jurisdiction court matters; (q) representing You in any tax matters; (r) representing You in any efforts to discharge student loans; (s) pursuing creditors for violations of the automatic stay, discharge injunction or Fair Credit Reporting Act; and (t) issues that arise that are not specifically listed in the Bankruptcy Services section. For such Non-Base Legal Services, Client will be charged $395.00 per hour for attorney time and $175/hour for paraprofessional time billed in 6-minute minimum increments, unless a flat fee is indicated. Non-Base Legal Services will not be provided by Firm unless a separate retainer agreement is executed by Firm and Client upon mutually acceptable terms.

(Doc. 9-1, p. 2-3).

The Second Contract contains the following termination provision:

**18. Termination Policy. Client has the right to cancel this Post-Petition Agreement and all financial obligations arising under that Post-Petition Agreement at any time within fourteen (14) days after signing it. Client may exercise Client's right to cancel the Post-Petition Agreement by notifying Firm in writing of Client's intent to cancel at 901 W Hillsborough Ave., Tampa, FL 33603. Upon receipt of said notice, Client consents to Firm's withdrawal as attorney of record in Client's pending bankruptcy case. Firm shall continue to represent Client until the Court enters an Order allowing Firm to withdraw from representation.**

(Doc. 9-1, p. 6).

Finally, the Second Contract includes the essential terms of the financing offered by Rebound.

## The Financing Agreement with Rebound

The final document signed by Debtor is a relatively simple financing agreement with Rebound (the "Financing Agreement").  (Doc. 19-2, p. 7-10).    The terms in the Financing Agreement are the same as set forth in the Disclosure and the Second Contract with three notable additions: (i) a "Late Charge" of the greater of $20.00 or 5% of an installment if a monthly installment payment is more than 10 days late; (ii) an arbitration clause; and (iii) a statement that "[t]he Annual Percentage Rate may be negotiable with Rebound. Rebound may assign this Agreement and retain its right to receive a part of the Finance Charge." (Doc. 19-2, p. 7-9).   The Financing Agreement also states that Debtor will not have to pay a prepayment penalty if he pays off the loan early.

## II.  Approval Motion and UST Motion

After signing the First Contract, the Second Contract, and the Financing Agreement, Debtor and Rebound, as well as the United States Trustee ("UST"), filed the instant motions seeking review of the agreements by this Court.  The issues before the Court are: (1) whether the bifurcated contracts for Chapter 7 bankruptcy services between Debtor and DRLG should be approved because they meet the standards set forth in *Walton v. Clark & Washington, P.C. (In re Walton)*, 469 B.R. 383 (Bankr. M.D. Fla. 2012), and *In re Brown*, 631 B.R. 77 (Bankr. S.D. Fla. 2021); and (2) whether Rebound may finance the post-petition legal fees incurred by the Chapter 7 Debtor.

### A.  Bifurcated Contracts for Chapter 7 Bankruptcy Services

*Walton* and *Brown* both hold that bifurcated contracts for Chapter 7 services are permissible so long as they comply with ethical and statutory requirements.[7]  This Court finds the

---

[7] *See Walton*, 469 B.R. at 387; *Brown*, 631 B.R. at 105.

analysis in both *Walton* and *Brown* to be thorough, comprehensive, and persuasive.  And, in an effort to develop consistency, the Court will apply both *Walton* and *Brown* to Debtor's financial arrangements by focusing on the minimum requirements for an acceptable bifurcated contract.

However, this Court notes that in *Brown*, the UST specially represented to the Bankruptcy Court for the Southern District of Florida that it was "NOT, at this time, arguing that fee bifurcation in chapter 7 cases should be prohibited."[8]  The UST now seems to take a more aggressive position. In opposition to the financing arrangement before the Court, the UST argues that bifurcated agreements are a "violation" of *Cadwell v. Kaufman, Englett & Lynd, PLLC*,[9] because the post-petition debt to be incurred by Debtor is intended to pay legal fees for a Chapter 7 case.  So, the Court will address whether *Cadwell* prohibits bifurcated fee agreements in Chapter 7.[10]

*Cadwell* did not involve a bifurcated fee agreement, but the Eleventh Circuit's analysis of 11 U.S.C. § 526(a)(4) is instructive.  In *Cadwell*, a potential Chapter 7 debtor hired a law firm to help him file a Chapter 7 petition.[11]  The client agreed to pay the law firm $1,700 in six installment payments before the bankruptcy petition would be filed.[12]  According to the client, the law firm instructed him to make the six payments using a credit card.[13]  After making four of the payments on two different credit cards, the client sued the law firm in federal district court for violating 11 U.S.C. § 526(a)(4).[14]  Section 526(a)(4) prohibits law firms from advising a potential debtor "to incur more debt . . . to pay an attorney or bankruptcy petition preparer a fee or charge for services performed as part of preparing for or representing a debtor in a [bankruptcy] case."[15]

---

[8] *See Brown*, 631 B.R. at 91.
[9] 886 F.3d 1153 (11th Cir. 2018).
[10] *Cadwell* was decided after *Walton*.
[11] *See Cadwell*, 886 F.3d at 1155.
[12] *See id.*
[13] *See id.*
[14] *See id.*
[15] 11 U.S.C. § 526(a)(4).

Assuming the allegations of the client's complaint to be true, the district court nevertheless granted the law firm's motion to dismiss for failure to state a claim, concluding that the mere advice by the law firm to use a credit card to pay legal fees did not violate § 526(a)(4).[16]  On appeal, the Eleventh Circuit reversed and stated that § 526(a)(4) "forbids lawyers from advising their clients 'to incur more debt . . . to pay an attorney . . . a fee or charge for services performed as part of preparing for or representing a debtor in a [bankruptcy] case.'"[17]  The Eleventh Circuit explained:

> That sort of advice is inherently abusive in at least two respects. First, it puts the attorney's financial interest—getting paid in full—ahead of the debtor-client's. If a creditor discovers the timing and reason for the fee-related debt, it could challenge the debt's dischargeability, thereby compromising the debtor's fresh start.  Second, it puts the lawyer's own interests ahead of the creditors' in that, while ensuring the lawyer's full payment, it leaves a diminished estate on which creditors can draw.[18]

Thus, an attorney may not advise his client to incur debt in order to pay the attorney for bankruptcy-related legal services.[19]  This is not a startling conclusion in light of the language of § 526(a)(4).  And, because the allegations of the client's complaint were presumed true—namely, that the attorney instructed him to incur the credit card debt to pay for legal fees—the conclusion that the client stated a claim for relief under § 526(a)(4) makes perfect sense.

However, *Cadwell* goes on to clarify that § 526(a)(4) does not prohibit attorneys "from discussing with debtors potential options and their legal consequences."[20]  Instead, § 526(a)(4) "merely prohibits [attorneys] from giving their clients 'affirmative advice' to incur more debt in

---

[16] *See Cadwell*, 886 F.3d at 1155.
[17] *Id.* at 1159 (quoting 11 U.S.C. §526(a)(4)).
[18] *Id.* (internal citation omitted).
[19] *See id.* at 1160.
[20] *Id.* at 1161.

order to pay for bankruptcy-related representation."[21]

The facts of *Cadwell* are unique because, by suing his attorneys, the client effectively waived any attorney-client privilege, and the courts had to presume (for purposes of the motion to dismiss) that the client's description of the "advice" from the attorney was true. Here, where Debtor has not waived the attorney-client privilege, the Disclosure is the operative document, and it does not recommend or advise Debtor to incur debt to pay DRLG's fees. Rather, the Disclosure presents options for paying for legal services: prepay the fee pre-petition (at a discount), pay the fee post-petition directly to counsel, or finance the fee post-petition through Rebound, a third-party financing company. It also presents other options available to Debtor that do not relate to DRLG, such as hiring a new attorney or proceeding in Chapter 7 without representation.

Furthermore, neither of the two concerns raised in *Cadwell* are implicated in this case. Unlike in *Cadwell* (where the credit card debt was ostensibly dischargeable), here, the post-petition debt is not dischargeable and the nature and extent of Debtor's discharge of pre-petition debt is not implicated. Indeed, the conduct in *Cadwell* was arguably a fraud on the credit card company, with the attorney allegedly complicit in the fraud. The pre-petition credit card debt allegedly advised by the attorney in *Cadwell* would have reduced distributions to other creditors by increasing the overall debt of the estate and would have left the potential debtor vulnerable to a discharge challenge on grounds that the credit card debt was fraudulently incurred. Here, Debtor's bankruptcy estate is not impacted by the Second Contract for post-petition fees, as no additional debt is added to the estate. If anything, the bankruptcy estate is potentially enhanced by the limited pre-petition *pro bono* services provided by Debtor's counsel.

The Court, therefore, rejects the argument that bifurcated agreements are *per se* prohibited

---

[21] *Id.*

under *Cadwell* or 11 U.S.C. § 526(a)(4).  As such, the Court will evaluate Debtor's bifurcated agreements under the standards set forth in *Brown* and *Walton*.

### 1.  Adequate Disclosure to the Client

First, and foremost, *Brown* and *Walton* require adequate disclosure to the client.  This means that the pre-petition agreement should clearly set forth the limited services provided pre-petition and the cost for such services.[22]  Likewise, the post-petition agreement should clearly set forth the services being provided post-petition and the cost for such services.[23]  The post-petition agreement should also clearly list the excluded and additional, optional services that the client can separately request the attorney to provide, as well as the additional costs for those services.[24]  Finally, the post-petition agreement must clearly state that the obligation to pay fees under the post-petition fee agreement is not an obligation that will be discharged when the debtor receives his or her bankruptcy discharge.[25]

The client must be able to review both the pre-petition agreement and the post-petition agreement before signing the pre-petition agreement.[26]  Along with the pre-petition agreement, the client should also be given a separate disclosure statement regarding the bifurcated fee arrangement that must be explained to the client and which the client must sign.[27]  The disclosure statement should inform the client that he or she has the following three options for proceeding post-petition: (1) retain the same attorney post-petition; (2) retain a new attorney post-petition; or (3) proceed *pro se* post-petition after the Court allows the attorney to withdraw.[28]  Finally, the

---

[22] *See Brown*, 631 B.R. at 100.
[23] *See id.*
[24] *See id.*
[25] *See id.* at 99-100.
[26] *See id.* at 100.
[27] *See Walton*, 469 B.R. at 388; *Brown*, 631 B.R. at 100.
[28] *See Brown*, 631 B.R. at 100.

client must sign the pre-petition agreement before the attorney files the bankruptcy petition, and the client must sign the post-petition agreement after the filing of the bankruptcy petition.[29]

### 2.  Provision of the Required Pre-Petition Services

Second, counsel must agree to provide the required pre-petition services.  This means that the attorney must initially meet with the client to ascertain whether filing bankruptcy is appropriate, and if so, the attorney must determine under what chapter a bankruptcy case should be filed.[30]  The attorney also must adequately inform the potential debtor of the consequences of that choice.[31]  The attorney must assist the client with all of the debtor's obligations under 11 U.S.C. § 521, unless the attorney is permitted to withdraw.[32]  If the court's local rules address the services that the attorney must provide when representing a client, those rules must be considered.[33]

"The attorney must prepare and file all documents necessary to commence the bankruptcy case, which includes, at a minimum, the petition, the creditor's matrix, any motion to waive or pay the filing fee in installments, the statement of attorney compensation, and the Debtor Credit Counseling Certificate, or, if applicable, a motion to waive the need to file or file late, the certificate."[34]  The attorney must also attend the section 341 meeting of creditors, unless the attorney is permitted to withdraw prior to the meeting.[35]

---

[29] *See Walton*, 469 B.R. at 388.

[30] *See Brown*, 631 B.R. at 95, 97-98.

[31] *See id.* at 98.

[32] *See id.*

[33] For example, under Local Rule 2091-1 for the Middle District of Florida, a bankruptcy attorney may limit the services to be provided if the attorney is acting *pro bono*.  The Southern District of Florida, in which the *Brown* court sits, does not have a similar local rule.  *But see In re Charles Pernell Prophet v. John P. Fitzgerald, III, United States Trustee*, No. 4:21-cv-01081-JMC, 2022 WL 766390 (D. S.C. Mar. 14, 2022) (reversing the bankruptcy court's ruling that its local rule, which imposed continuing duties on bankruptcy counsel who file a bankruptcy petition, prohibited bifurcated fee agreements in Chapter 7).

[34] *See Brown*, 631 B.R. at 98.

[35] *See id.*

### 3.  Cooling Off Period

Third, the client must be given at least a 14-day cooling off period.  This means that the client must be given either: (1) 14 days after signing the post-petition agreement to cancel the agreement, or (2) a 14-day cooling off period between filing the petition and signing the post-petition agreement.[36]  The attorney must continue to represent the client during the 14-day period, and if the client does not sign the post-petition agreement, the attorney must continue to represent the client until the court grants the attorney's motion to withdraw.[37]

### 4.  Adequate Disclosure to the Court

Fourth, there must be adequate disclosure to the court.  "Bankruptcy Rule 2016 requires that every attorney for a debtor (regardless of whether the attorney is applying for compensation) shall file the statement required by [Bankruptcy Code] section 329."[38]  Furthermore, "[s]ection 329 requires a disclosure of the compensation paid or to be paid if the agreement was made within one year before the date of filing the petition . . . and [the identification of] the source of the compensation."[39]

For bifurcated fee agreements, adequate disclosure to the court means that the attorney must initially disclose to the Court the limited services to be provided under the pre-petition agreement and describe the payment for those services.[40]  The attorney must also file a supplemental disclosure after the post-petition agreement is signed and describe the payment structure thereunder.[41]

---

[36] *See Walton*, 469 B.R. at 388; *Brown*, 631 B.R. at 99, 101.
[37] *See Walton*, 469 B.R. at 388; *Brown*, 631 B.R. at 99.
[38] *See Brown*, 631 B.R. at 100.
[39] *See id.*
[40] *See Walton*, 469 B.R. at 386.
[41] *See id.*

### 5.  Reasonable Fees

Fifth, the fees charged both pre-petition and post-petition must be reasonable.  The reasonableness of the fees is analyzed on the basis of the services being provided, not compared to each other (*i.e.*, the amount of pre-petition fees is not simply compared to the amount of post-petition fees).[42]  The amount of a "'flat fee must bear some relationship to the work that will likely be required, which inevitably depends on the unique facts and circumstances of the case.'"[43]  Thus, when reviewing the reasonableness of fees after-the-fact, courts will review the reasonableness of a post-petition flat fee charged "by taking into account not only the work that was done but also the services that might have been required in the case for which there would have been no additional charge."[44]  In determining the reasonableness of a flat fee, courts "should not consider services that would not possibly arise in the case, such as dealing with student loan issues when the debtor does not have student loans."[45]  Finally, when any of the required pre-petition services are promised post-petition, those required pre-petition services cannot be considered in determining the reasonableness of the post-petition flat fee charged.[46]

### 6.  Filing Fee

Sixth, the attorney's law firm cannot pay the filing fee for the client and then seek repayment post-petition.[47]  The filing fee is due with the filing of the petition, and as such, that pre-petition obligation is dischargeable.[48]

---

[42] *See Brown*, 631 B.R. at 93-94.
[43] *See id.* at 94 (quoting *In re Dabney*, 417 B.R. 826, 831 (Bankr. N.D. Ga. 2009)).
[44] *See Brown*, 631 B.R. at 94.
[45] *See id.*
[46] *See id.* at 95.
[47] *See id.* at 102-03.
[48] *See id.*

### 7.  Applying the *Brown/Walton* Requirements

Many of the requirements articulated in *Brown* and *Walton* are present here.  The pre-petition contract signed by Debtor offers limited *pro bono* assistance.   Under the local rules of this Court, unbundling or limiting services is permissible if the attorney is acting *pro bono*. Specifically, this Court's Local Rule 2091-1 provides that "an attorney who provides *pro bono* representation to a debtor may limit the representation to specified tasks in accordance with the Rules of Professional Conduct."  This limited services exception for *pro bono* representation makes sense, and the UST does not seriously challenge the First Contract for *pro bono* services between Debtor and DRLG.  Rather, the UST argues that DRLG is using the Two Contract Program to recoup its fees for pre-petition work, if the client signs the Second Contract.  But the fact remains that DRLG provides limited *pro bono* services and assumes the risk that Debtor will not sign the post-petition Second Contract.

There is also no issue here with respect to the filing fee.  Debtor is responsible for the fee whether paid in full pre-petition or paid in installments post-petition. Debtor chose to pay the fee in full pre-petition.

Finally, there is no suggestion that Debtor did not have an opportunity to review the Second Contract before signing the First Contract or that Debtor was given insufficient time to consider or rescind the Second Contract.  Debtor was provided with a 15-day period to retain counsel after the bankruptcy petition was filed, as well as a 14-day cooling off period after Debtor signed the Second Contract.

### a.  Adequate Disclosures

All that said, the Court agrees with the UST that certain disclosure deficiencies in DRLG's Two Contract Program exist.  First, setting aside the financing disclosures (which are discussed

later), the Second Contract purports to distinguish "Base Legal Services" (which are included in the flat fee) from "Non-Base Legal Services" (which may be provided on an hourly basis or at an additional flat-fee basis post-petition). Unfortunately, there is overlap and ambiguity between the base and non-base services. As examples:

| Base Legal Services | Non-Base Legal Services |
|---|---|
| Preparing and filing schedules and any amendments to them | (k) filing amendments to the schedules |
| Attending the 341 meeting and any continuations | (l) appearing for a continued 341 meeting |
| Administrating and monitoring the case | (n) monitoring an "asset case" |
| Reviewing and advising about any Rule 2004 examinations and attending such examinations | (g) Rule 2004 examinations |
| Reviewing and advising regarding motions for stay relief | (e) motions for relief from stay, or continuation, defense, or enforcement of the automatic stay |
| Reviewing and advising regarding lien avoidance matters | (h) motions to avoid liens |

At the preliminary hearing, DRLG acknowledged this overlap and ambiguity, but counsel argued that the ambiguity is necessary "just in case." Counsel's explanation/justification is not sufficient. There must be a clear delineation of the base legal services being provided and those that are not. Without such a delineation, it is impossible for the client (or the court) to determine the reasonableness of the flat fee charged. Reasonableness is evaluated based on the specific services that counsel has agreed to provide. With a flat fee, counsel will never know for certain what post-petition services will be necessary. As with any flat fee, the law firm hopes that most of the time it will make money, but it knows that sometimes it will not. In any event, the services that the law firm agrees to provide must be clearly disclosed, and such services must be provided if they are necessary.

For example, in this case, the UST has moved to dismiss Debtor's case under 11 U.S.C. § 707(b)(3).  (Doc. 24).  In that motion, the UST argues that, although Debtor remains below medium income under the Means Test, Debtor's bankruptcy is abusive because, without the garnishment in place, Debtor can repay his creditors.  Setting aside the merits of the UST's motion to dismiss, it is unclear whether DRLG's flat fee includes defense of the motion.

Second, DRLG also must conspicuously disclose that the obligation to pay post-petition fees will not be discharged.  Although the Second Contract has some appropriate language, it is not clearly brought to Debtor's attention.  Instead, it is hidden in Section 14, which is titled, "Important Information about Conflicts of Interest."  (Doc. 9-1, p. 4).  Paragraph C of Section 14 states, in relevant part:

> You are not required to sign this Post-Petition Agreement, but Firm filed Your case hoping that You would sign it, and this creates a conflict of interest between You and the Firm since executing this Post-Petition Agreement obligates You to make payments that will not be discharged in Your bankruptcy.

(Doc. 9-1, p. 4).  The fact that Debtor's obligation to pay fees under the Second Contract is not an obligation that will be discharged when Debtor receives his bankruptcy discharge needs to be more conspicuously set forth in the Second Contract.

Third, the Second Contract and proposed financing must be disclosed to the Court in the form of a supplemental disclosure statement filed within 14 days after the Second Contract is signed, as required by Bankruptcy Rule 2016(b).  Rule 2016(b) plainly contemplates the filing of a supplement "within 14 days after any payment or agreement not previously disclosed."  In this case, although the Second Contract is attached to the Approval Motion, Debtor's counsel has not yet filed a supplemental disclosure under Rule 2016(b).

### b.  Reasonable Fees

The UST challenges the reasonableness of the $2,000 flat fee charged by Debtor's counsel. By comparing the work that was supposed to be done pre-petition with the work to be done post-petition, the UST assumes the Second Contract necessarily compensates the attorney for pre-petition work.  This comparison analysis has been rejected by at least two courts, including *Brown*, because the reasonableness of pre- and post-petition fees must be evaluated independently and "not compared to each other."[49]   Nevertheless, until it is clear what services are and are not included in $2,000 flat fee, it is premature for the Court to determine if the $2,000 flat fee is reasonable or consistent with the Local Rules of this Court.[50]

### c.  Other Considerations

*Brown* and *Walton* lay out the *minimum* requirements for an acceptable bifurcated contract for Chapter 7 bankruptcy services.  There are other concerns as well.  The UST has identified the following issues, which the Court agrees are not properly dealt with in the signed agreements before the Court: (1) DRLG may not share Debtor's financial information with Rebound; (2) DRLG may not reveal attorney-client privileged information to Rebound; (3) DRLG must continue to represent Debtor in the bankruptcy case, even if Debtor fails to make all of the required payments to Rebound and Rebound pursues collection activities against Debtor; (4) any services provided to Debtor, beyond what is included within the flat fee, must be under a separate and properly disclosed agreement; (5) the refund policy in the Second Contract, which states that fees that are paid are earned and non-refundable, must be modified to disclose that fees will be refunded

---

[49] *Brown*, 631 B.R. at 93; *accord Carr*, 613 B.R. at  438-39.

[50] An evaluation of reasonableness requires an individualized review of the specific services being provided and requires submission of evidence.  For example, in *Hazlett*, the court evaluated the reasonableness of the fees charged—zero owed pre-petition and a retainer of $2,400 charged post-petition to cover attorneys' fees and costs, including the $350 filing fee—on a motion for summary judgment.  *See Hazlett*, 2019 WL 1567751, at *11.

if the Bankruptcy Court orders DRLG to do so; and (6) the Second Contract should provide that Debtor may opt-out from receiving communications from DRLG via automated dialers and pre-recorded messages.

The Court will not spend much time with these concerns because Debtor, DRLG, and Rebound have agreed to address them.  Debtor and Rebound attached to their reply brief an amended draft version of the Second Contract, which has not been signed by Debtor or DRLG. (Doc. No. 22).  However, the Court will not approve or review the draft document and give an advisory opinion.[51]

### B. Financing Post-Petition Legal Fees

The next question is whether Rebound may finance Debtor's post-petition legal fees under the Financing Agreement.  Specifically, Rebound offers to pay $2,000 to DRLG.  In exchange, Debtor agrees to repay Rebound $2,000 plus interest at 17.99% in twelve monthly payments of $183.35, for a total amount due (including interest) of $2,200.20.  (Doc. 9-1, p. 7).

There is also an agreement between Rebound and DRLG (a copy of which is not before the Court) that provides that Rebound will separately invoice DRLG a processing fee of $120 for this financing arrangement.  Rebound will not deduct the $120 processing fee from the $2,000 Rebound pays to DRLG.  Instead, DRLG will separately pay Rebound the $120 processing fee after Rebound invoices DRLG.  This arrangement between Rebound and DRLG was not disclosed to Debtor.

---

[51] The UST also argues that Debtor cannot afford to enter into the Second Contract.  Specifically, the UST points out that according to Debtor's schedules, Debtor only has $19.99 in net monthly income after paying his expected expenses—not nearly enough to cover the $183.35 monthly fee in this case.  (Doc. 8, p. 21). And yet, as described above, the UST now moves to dismiss Debtor's Chapter 7 case because Debtor can repay his creditors now that he has filed bankruptcy and his wage garnishment is eliminated.  (Doc. 24).

Generally, a bankruptcy court does not get involved in a Chapter 7 debtor's post-petition financial affairs.[52]  However, because the Financing Agreement is part of a larger agreement to bifurcate Chapter 7 attorney fees, review of the Financing Agreement is appropriate and necessary.[53]

A non-binding advisory opinion by the Florida Bar appears to condone an attorney offering clients options for financing attorney's fees with an independent, third-party lender.[54]  Likewise, an opinion from the American Bar Association[55] emphasizes the need for counsel's independence from the lender to avoid the prospect of an attorney doing business with a client—conduct expressly prohibited by Florida Rule of Professional Conduct 4-1.8(a).  Here, Rebound's counsel indicated during the preliminary hearing that an ethical opinion from the Florida Bar was being sought (and it may have since been obtained) to evaluate the proposed financing arrangement under the Florida Rules of Professional Conduct.  Nevertheless, the propriety of the financing arrangement under the Bankruptcy Code is quite a different issue.

The parties have not cited to, and the Court has not been able to find, cases analyzing the issue of third-party financing arrangements like what is proposed here.[56]  However, Debtor's financing arrangement again implicates § 526(a)(4).  That statute states that a "debt relief agency," such as DRLG, shall not:

> advise an assisted person or prospective assisted person to incur more debt in contemplation of such person filing a case under this title or to pay an attorney or bankruptcy petition preparer a fee or charge for services performed as part of preparing for or

---

[52] *See In re Green*, No. 20-10694, 2020 WL 7487785, at *1 (Bankr. N.D. Ind. Aug. 31, 2020) (stating that "[t]he bankruptcy court has no jurisdiction over a Chapter 7 debtor's post-petition financial affairs, except to the extent that they may involve issues associated with a discharge").

[53] *See, generally*, 11 U.S.C § 329.

[54] *See* FL Eth. Op. 16-2 (Fla. St. Bar Assn.), 2016 WL 8648795 (Oct. 21, 2016).

[55] LAWYER'S FEE, ABA Formal Op. 18-484 (Nov. 27, 2018).

[56] The Court notes that this is not a factoring arrangement, and thus, cases evaluating factoring arrangements are not on point.

representing    a    debtor    in    a    case    under    this    title.[57]

As discussed above, the operative prohibition in § 526(a)(4) is to "advise." Presenting or discussing options, and their legal ramifications, is not advice withing the meaning of this statute.[58] The Disclosure given to Debtor provides options and states that post-petition legal fees "may be paid in full from Client's own resources" or "may be financed, if approved, by a third-party finance company, Rebound Capital, LLC."[59] Simply presenting a financing option from an independent third-party does not, itself, violate § 526(a)(4).

That said, the three-party (Debtor, DRLG, and Rebound) financing arrangement here requires far more disclosure than what was given to Debtor or the Court. On its face, certain provisions in the Second Contract (which DRLG and Rebound have agreed to remove) and the high interest rate in the Financing Agreement,[60] suggest a relationship between DRLG and Rebound that may not be entirely independent and which may have the potential for abuse. But it also suggests to the Court that the relationship is a work in progress.

At a minimum, a description of the relationship between DRLG and Rebound, as well as the fact that DRLG will pay Rebound a $120 processing fee, should be disclosed to Debtor before he signs the First Agreement. And, if any member of DRLG is or becomes involved with Rebound financially or managerially, this certainly must be disclosed to Debtor (and the Court) so that the arrangement can be properly evaluated under the Bankruptcy Code.[61]

---

[57] 11 U.S.C. § 526(a)(4).

[58] *See Cadwell*, 886 F.3d at 1161.

[59] Doc. 19-1, p. 7.

[60] The Court urges reconsideration of the 17.99% interest rate charged by Rebound. It is very near 18%, which is the highest rate permitted under Florida law under these circumstances. *See* Fla. Stat. § 687.03(1). Anything higher is usurious under Florida law. *See* Fla. Stat. § 687.02(1).

[61] At the preliminary hearing, it was suggested that if the Court approved the financing arrangement in this case, an attorney with DRLG would join Rebound in some capacity. This is an important consideration in evaluating the arrangement, and this information was not shared with Debtor.

### III.  Conclusion

The Court is sensitive to the problem of unrepresented debtors struggling with the intricacies of bankruptcy law.  *Pro se* debtors also tend to consume more judicial time and resources than represented debtors, and the Middle District of Florida has one of highest number of *pro se* debtors in the country.  The Court is also sensitive to the realities of practicing law and the burden on debtors' counsel of carrying the costs of representing consumer debtors.  Some have suggested that consumers who cannot afford to file a Chapter 7 bankruptcy case should simply file under Chapter 13, where it is permissible to pay attorneys' fees post-petition.  But the flat rate fee proposed for this Chapter 7 case is $2,000, while the flat rate for a Chapter 13 case in the Middle District of Florida is $4,500.  That is not realistic or fair to prospective debtors.[62] The concept of a bifurcated fee agreement is not perfect, and it is, admittedly, a work around that must be very carefully drafted and implemented.  But with adequate disclosure and attention to detail, it can be crafted in such a way as to satisfy the requirements of the Bankruptcy Code.

Accordingly, this Court finds no *per se* violation of the Bankruptcy Code with an optional two-contract approach that bifurcates Chapter 7 legal fees, so long as the arrangement satisfies the *Brown/Walton* requirements and the Local Rules of the Court. Nor is it a violation § 526(a)(4) for an attorney to present a "third party" financing option to a client, so long as it is given as an option and not as affirmative advice to incur the debt.  However, the signed Second Contract with DRLG and the signed Financing Agreement with Rebound cannot be approved or properly evaluated without further modification and disclosure.

---

[62] Indeed, attorneys have been routinely criticized for channeling prospective debtors (particularly minority debtors) into filing under Chapter 13 when a Chapter 7 bankruptcy would be more appropriate. *See, e.g., ABI Commission on Consumer Bankruptcy*, 2017–2019 Final Report and Recommendations, at pp. 159-66, available at https://www.nclc.org/images/pdf/bankruptcy/rpt-abi-commission-on-consumer-bankruptcy.pdf; Katherine M. Porter, Pamela Foohey, Robert M. Lawless and Deborah Thorne, "'No Money Down' Bankruptcy," 90 S. Cal. L. Rev. 1055 (2017), available at https://www.repository.law.indiana.edu/facpub/2639.

For these reasons, it is **ORDERED**:

(1)     The Court **GRANTS** the UST Motion (Doc. 19) to the extent the Trustee asks the Court to review the agreements before the Court; otherwise, the UST Motion is **DENIED** without prejudice.

(2)     The Court **DENIES** without prejudice Debtor and Rebound's Approval Motion (Doc. 9).

(3)     Debtor and Rebound shall have 30 days to file, consistent with this Order: (a) an amended bifurcated post-petition agreement between Debtor and DRLG (along with an amended disclosure document), (b) an appropriate Rule 2016 disclosure, and (c) an amended financing agreement between Rebound and Debtor.

(4)     The United States Trustee thereafter will have 21 days to raise any further objections to the amended agreements.

(5)     If an amended bifurcated post-petition agreement with an amended disclosure document, Rule 2016 disclosure, and/or an amended financing agreement is not timely filed by Debtor and Rebound, the request of the United States Trustee in the UST Motion to void the currently signed post-petition agreement between Debtor and Debtor's counsel, as well as the financing agreement between Debtor and Rebound, will be granted and those agreements will be cancelled.

Attorney Erik Johanson is directed to serve a copy of this order on interested parties who do not receive service by CM/ECF and file a proof of service within three days of its entry.